Opinion issued December 22, 2011.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00635-CR

———————————

Carlos Rodriguez, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 184th District Court

Harris County, Texas



Trial Court Case No. 1172466

 



MEMORANDUM OPINION

A jury convicted appellant, Carlos Rodriguez, of murder and
assessed his punishment at seventy-five years’ confinement.[1]  In three issues, Rodriguez contends that: (1)
the trial court erred in allowing into evidence testimony and exhibits of
extraneous crimes, conduct, wrongs, and bad acts that relate to MS-13 gang
membership or affiliation; (2) the trial court erred in denying his amended
motion to suppress his statement; and (3) without his statement, the evidence
is insufficient to support his conviction.

We
affirm.

                                                                                                                                                                
Background

On
the night of June 21, 2008, Manuel Sandoval hosted a birthday party for his wife’s
friend.  Among the thirty to forty people
in attendance were Ernesto Garcia, the complainant, and three people who worked
with Sandoval at his landscaping company: appellant, Joaquin Guevara, and Eliseo Perez.  After
midnight, appellant, Sandoval, Garcia, Guevara, and Perez left the house in
Sandoval’s black Ford Expedition to buy more beer.  Sandoval drove, Guevara sat in the front
passenger seat, appellant sat in the back seat behind Guevara, Garcia sat in
the back seat behind Sandoval, and Perez sat in the middle of the third row of
seats. 

The
first store at which Sandoval stopped was closed, and Guevara told him to
continue driving to look for another store.  As they were riding, Sandoval testified that Guevara
was dancing in the seat, “making signs,” and repeating the phrase “my throat is
dry” several times to those in the back of the car.  Sandoval also testified that shortly afterwards,
he saw appellant stab Garcia several times.  He could not see what Perez was doing.  Perez later stated to police that he also
stabbed Garcia because he and appellant were MS-13 “soldiers” on a “mission”
from Guevara, their leader.  Perez also
told police that appellant had the bigger of the two knifes, that appellant
stabbed Garcia many more times than he did, and that appellant “finished off”
Garcia after his own knife broke. 
However, at trial, Perez testified that he lied to police about what
happened based on a fear of going to prison alone; that, in reality, he was the
only one who stabbed Garcia; and that he did so because he saw Garcia
struggling with appellant. 

Guevara
then directed Sandoval to find a street to turn onto.  Sandoval turned at the first road he saw and
stopped the truck, and Guevara removed Garcia’s body from the car.  Guevara told Sandoval to drive back to his
home and, once they arrived, told him that they were going to take his truck.  Perez, Guevara, and appellant then left with
Sandoval’s vehicle.  The following day, Guevara
informed Sandoval that his truck had been burned and told him to report it
stolen.  Two hours after Sandoval
reported his vehicle stolen, the truck was discovered
completely burned.  The body of Ernesto
Garcia was discovered by a citizen in the early hours of June 22, 2008.

Investigating
officers took two statements from Sandoval, which led them to arrest the other
men in the vehicle, including appellant. 
Following his arrest, officers took appellant to the investigation
facility and questioned him.  The officers video-recorded appellant’s statement regarding the
events of the evening.  Appellant told
investigators that he stabbed Garcia in self-defense because, in the car on
their way to get more beer, Garcia attempted to rob him of his wallet and in
the resulting scuffle Garcia was somehow stabbed. 

Appellant
moved to suppress his statement on the ground that he did not knowingly and
voluntarily waive his rights.  Following the
suppression hearing, the trial court denied appellant’s motion to suppress and
made findings of fact.

At
trial, several officers and other law enforcement personnel testified regarding
their roles in the investigation, including Deputy J. Balderas, who responded
to the 911 call of the person who discovered Garcia’s body; Deputy V. Vu, a
crime scene investigator with the Harris County Sheriff’s Office (“HCSO”) assigned
to the scene where Garcia’s body was discovered; Deputy F. Rivera, an
investigator with the HCSO who helped take appellant’s statement; Deputy J.
Cassidy, another HCSO deputy who interviewed Sandoval and, along with Deputy
Rivera, discovered appellant hiding inside his apartment and observed him
exhibiting odd behavior; and Deputy M. Quintanilla, the lead investigator on
the case.  Deputies Quintanilla and
Cassidy both testified that Sandoval was not considered a suspect in the
murder, even though they did not believe he was initially honest with
investigators.  Cassidy testified that
Sandoval was hesitant to tell police the truth about the murder because he
feared that MS-13 gang members would retaliate against his family.  Jose Garcia, the complainant’s uncle,
testified for purposes of identifying the complainant.  

Dr.
Mary Anzalone, the assistant medical examiner who
performed Garcia’s autopsy, testified regarding his cause of death.  She described in detail the thirty-four
sharp-force injuries present on Garcia’s head, torso, and extremities, including
wounds that perforated his jugular vein and carotid artery, his pulmonary
artery and left lung, his diaphragm, and his colon.  She testified that while some of Garcia’s
wounds were superficial and defensive in nature, particularly the ones on his
hands and arms, many of the wounds could have been fatal, and they could have
been caused by two different sharp-edged instruments.  She testified that Garcia died of multiple
sharp-force injuries.

Manuel
Sandoval testified regarding the events of the night Garcia was murdered, and
he also testified about his knowledge of appellant’s, Perez’s, and Guevara’s
gang affiliations.  Eliseo
Perez testified regarding the events of the night of the party and the
stabbing.  He testified that he,
appellant, Guevara, Sandoval, and Garcia left the party to get beer and that he
stabbed Garcia because he saw that Garcia “wanted to do something” to
appellant.  Perez testified that, after
the stabbing, the others left Garcia’s body on the side of the road and then
returned to the party and dropped Sandoval off and that he was aware the
vehicle was later burned.  Perez
testified extensively about the details regarding where everyone was sitting,
the number of times he believed Garcia was stabbed, and his previous statement
to police regarding his involvement in the stabbing.  Perez also testified regarding his,
appellant’s, and Guevara’s affiliation with the Mara Salvatrucha,
or MS-13, gang.

The
jury convicted appellant of murder, and proceeded to hear the evidence at
punishment.  Deputy Quintanilla testified
again, as did Houston Police Department Officer A. Gorham-Maki, an expert on
gang activity.  The jury assessed
appellant’s punishment at seventy-five years’ confinement.  This appeal followed.

                                                                                                                                                        
Gang Affiliation

In
his first issue, appellant contends that the trial court abused its discretion
when it allowed testimony and exhibits relating to his gang membership and
affiliation.  Appellant argues that the
State failed to show: (1) that the evidence of his affiliation with the MS-13
gang was relevant, (2) that it was admitted for any other purpose than for
showing propensity or conformity, and (3) that its probative value substantially
outweighed the dangers of unfair prejudice even if it was relevant.

A.              
Relevant Background

Appellant
requested and was granted a motion in limine
disallowing any reference to his gang membership or affiliation without first
approaching the bench.  During Perez’s
testimony, the State approached the trial court and asked for permission to
question Perez regarding a gang tattoo that was visible to the jury and that
Perez had acquired after the stabbing. 
Appellant objected, arguing that “anything that is done after his arrest
has got nothing to do with [appellant] and his trial.  It’s inflammatory.  It’s prejudicial.”  The trial court sustained appellant’s
objection. 

Later
in the trial, in its re-direct examination of Perez, the State again approached
the trial court, this time regarding admission of Perez’s pretrial statement to
police that the killing was gang-related.  Appellant objected to the State’s introduction
of any evidence of gang affiliation because appellant did not raise it during
his cross-examination.  The court
overruled his objection, stating that Perez’s statement that the stabbing was
part of a gang “mission” was relevant to appellant’s motive.  The State proceeded to question Perez about
his statements that appellant was mad at Garcia for hitting on his girlfriend,
that he and appellant were MS-13 “soldiers” on a “mission” lead by Guevara, and
that the signal to attack Garcia was the phrase “my throat is dry.”  Perez testified that he remembered making
some of those statements but not others. 
Perez stated that he was the only one who stabbed Garcia, that he
stabbed Garcia in an attempt to help appellant because he saw that Garcia and
appellant were struggling, and that he told police appellant was involved in
the stabbing because he did not want to go to jail alone.  

The
State also questioned Perez about the meaning of the tattoo on his head, and
Perez testified that it said “MS la Mara” and that MS stood for “Mara Salvatrucha.”  Perez
testified that he had been a part of the Mara Salvatrucha
gang for two years, but that Sandoval was not a gang member.

When
the State sought to question Perez concerning photographs of himself,
appellant, and Guevara making gang signs, appellant objected.  He stated, “I’ve got an ongoing objection. .
. .  I’m going to have the objection that
it’s inflammatory, prejudicial and [of] no probative value as to [whether
appellant is] guilty of murder or not guilty.” 
The trial court overruled the objection, the photos were admitted into
evidence, and Perez testified that they showed himself,
appellant, and Guevara making gang signs associated with the Mara Salvatrucha gang.

The
jury heard additional testimony regarding appellant’s gang affiliation from
Manuel Sandoval, Deputy Quintanilla, Deputy Cassidy, and Officer
Gorham-Maki.  Sandoval testified that, on
the night of the murder, he witnessed Guevara dancing in his seat and making
what he believed to be gang signs to both appellant and Perez.  Sandoval also stated that he was aware of
appellant’s, Guevara’s, and Perez’s gang affiliation, that he heard Guevara
repeat “my throat is dry” several times, and that MS-13 gang members had
threatened his family in El Salvador.  Deputy
Cassidy testified that Sandoval originally lied to investigators because he was
afraid of gang retaliation.  

Deputy
Quintanilla testified that, after questioning Sandoval, he believed that MS-13,
or Mara Salvatrucha, gang members were involved in
the murder and that Sandoval provided the names of some of the gang
members.  Deputy Quintanilla testified
that, in the course of his investigation, he received consent to search the
apartment where he arrested Perez.  One
of the things he discovered in the course of the search were
photographs “depicting males . . . throwing gang signs, mainly belonging to the
MS-13 gang.”  Quintanilla testified that
the photographs depicted Perez, Guevara, and appellant wearing colors and
symbols and making signs affiliated with MS-13 gang membership.  The photos were admitted into evidence.  

Similar
photos were also used during the punishment phase of trial.  Officer Gorham-Maki testified about the
structure of the MS-13 gang, its discipline and rules for members, its criminal
activities, common hand signals, attire, and tattoos associated with that gang,
and MS-13’s use of nicknames.  Officer
Gorham-Maki also testified about photographs found in appellant’s apartment
that showed gang signs, dress, and tattoos associated with MS-13.

B.              
Standard of Review

We
review a trial court’s ruling on the admissibility of evidence under an abuse
of discretion standard.  Casey v. State, 215
S.W.3d 870, 879 (Tex. Crim. App. 2007). 
“A trial court abuses its discretion when its decision lies outside the
zone of reasonable disagreement.”  Id. 
The trial judge should not be reversed simply because an appellate court
believes that it would have decided the matter otherwise.  Powell v. State, 189 S.W.3d 285, 288 (Tex. Crim. App. 2006).  We will uphold an evidentiary ruling if it is
reasonably supported by the record and correct under any applicable legal
theory.  Martinez v. State, 91 S.W.3d 331, 336
(Tex. Crim. App. 2002).

“‘Relevant
evidence’ means evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence.”  Tex R. Evid. 401.  In
general, relevant evidence is admissible, and evidence that is not relevant is
inadmissible.  Tex. R. Evid.
402.  However, under certain
circumstances, even relevant evidence can be excluded.  Rule 403 provides that evidence “may be
excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, or needless presentation of cumulative
evidence.”  Tex. R. Evid. 403.  

A
proper Rule 403 analysis requires the trial court to balance the following
factors:

(1) the
inherent probative force of the proffered item of evidence along with (2) the
proponent’s need for that evidence against (3) any tendency of the evidence to
suggest decision on an improper basis, (4) any tendency of the evidence to
confuse or distract the jury from the main issues, (5) any tendency of the
evidence to be given undue weight by a jury that has not been equipped to
evaluate the probative force of the evidence, and (6) the likelihood that
presentation of the evidence will consume an inordinate amount of time or
repeat evidence already admitted.

 

Casey,
215 S.W.3d at 880. 
The court determines the probative value of evidence by determining how
strongly the evidence “serves to make more or less probable the existence of a
fact of consequence to the litigation” coupled with the proponent’s need for
that item of evidence.  Id. at 879.  Then, the trial court must assess whether the
probative value is substantially outweighed by one of the countervailing
considerations listed in Rule 403.  Id.  The
trial court has considerable freedom in weighing the probative value of
evidence in relation to its prejudicial effect. 
Montgomery v.
State, 810 S.W.2d 372, 378 (Tex. Crim. App. 1991) (op. on reh’g).  In
close cases, the trial court should favor admission in keeping with the
presumption of admissibility of relevant evidence.  Hernandez v. State, 817 S.W.2d 744, 746 (Tex. App.—Houston [1st
Dist.] 1991, no pet.).

Rule
404(b) excludes evidence of other crimes, wrongs, or acts admitted only for the
purpose of proving “the character of a person in order to show action in
conformity therewith,” but it provides that such evidence may be admissible
“for other purposes, such as proof of motive, opportunity, intent, preparation,
plan, knowledge, identity, or absence of mistake or accident. . . .”  Tex R. Evid. 404(b).  Gang affiliation is considered Rule 404(b)
evidence of a crime, wrong, or act subject to exclusion.  See Pondexter v. State, 942 S.W.2d 577,
583–84 (Tex. Crim. App. 1996). 
However, during the guilt-innocence phase of the trial, gang affiliation
is considered relevant and admissible to refute a defensive theory.  See Tibbs v. State, 125 S.W.3d 84, 89 (Tex. App.—Houston
[14th Dist.] 2003, pet. ref’d).

C.              
Admission of Gang Affiliation during
Guilt-Innocence

Appellant argues that the evidence of his affiliation with
the MS-13 gang was irrelevant and that the State failed to prove that it was
admitted for any purpose other than for showing his propensity to act in
conformity with his other acts as a gang member.  Appellant also argues that, even if that
evidence was relevant, the danger of unfair prejudice substantially outweighed
the evidence’s probative value.  Thus,
appellant’s objections are based on Rules of Evidence 401, 402, 403, and
404(b).

1.                
Relevance and admissibility under Rule 404(b)

Texas courts have held that gang membership evidence is
admissible under Rule 404(b) and Rule 402 if it is relevant to show a
non-character purpose that, in turn, tends to show the commission of the
crime.  See, e.g., Ortiz v. State,
93 S.W.3d 79, 94 (Tex. Crim. App. 2002) (holding that evidence of gang
affiliation is admissible under Rule 404(b) to show variety of non-character
purposes); Trevino v. State, 228
S.W.3d 729, 735 (Tex. App.—Corpus Christi 2006, pet. ref’d)
(“Gang affiliation evidence is relevant evidence of motive to show intent to
kill and is permissible under rule 404(b).”); Tibbs, 125 S.W.3d at 89 (holding
that evidence of gang affiliation was admissible to rebut appellant’s defensive
theories that complainant started fight and appellant acted in
self-defense).  

Here, appellant’s defensive theory was that Garcia first
attempted to steal his wallet and that he stabbed Garcia in self-defense in the
ensuing scuffle.  Perez also testified
that he stabbed Garcia because he saw him struggling with appellant.  Thus, testimony of appellant’s gang
affiliation and the statements that the killing was carried out as a gang
“mission” in response to Garcia’s behavior toward appellant’s girlfriend were
relevant and admissible to show appellant’s motive and to rebut his
self-defense theory.  See Tibbs, 125 S.W.3d at 89.

2.                
Rule 403 factors

“The term ‘probative value’ refers to the inherent
probative force of an item of evidence—that is, how strongly it serves to make
more or less probable the existence of a fact of consequence to the litigation—coupled
with the proponent’s need for that item of evidence.”  Casey,
215 S.W.3d at 879. 
“‘Unfair prejudice’ refers to a tendency to suggest decision on an
improper basis, commonly, though not necessarily, an emotional one.”  Id. at 879–80.  The
evidence must be unfairly
prejudicial, as virtually all evidence offered by a party to a lawsuit will be
prejudicial to the opposing party.  Montgomery, 810 S.W.2d
at 378.  Other factors include the
tendency of the evidence to confuse or distract the jury from the main issues
and the likelihood that the presentation of the evidence will consume an
inordinate amount of time or be unnecessarily repetitive.  See Casey,
215 S.W.3d at 879 (citing Gigliobianco v. State,
210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). 
These factors may well blend together in practice.  Gigliobianco, 210 S.W.3d at 642.

Although evidence of involvement with a gang can be highly
prejudicial, here the probative value of the evidence to establish appellant’s
motive and the State’s need to use the evidence to rebut his self-defense
theory outweigh any unfair prejudice.  Evidence
of appellant’s gang affiliation served to make his theory that he acted in
self-defense less probable, and the State’s need for such evidence to rebut
that defensive theory was strong.  See Casey, 215 S.W.3d at 883–84 (holding
trial court did not abuse its discretion in admitting prejudicial photographs
where photographs supported testimony of complainant that she did not consent
to sexual encounter and demonstrated appellant’s modus operandi and stating, “Although this evidence might have been
inadmissible under Rule 403 had the defense not put [the complainant’s]
character, motives, recollection, and conduct on trial, once he chose that
strategy, the trial judge did not abuse her discretion in permitting the State
to rebut it with modus operandi
evidence.”).

Appellant argues that the State introduced an
“over-whelming amount of MS-13 gang affiliation evidence without conducting a
balancing test.”  However, we presume
that the trial court conducted a Rule 403 balancing test, and a silent record
does not imply otherwise.  Williams v. State, 958
S.W.2d 186, 195–96 (Tex. Crim. App. 1997).  Furthermore, the record does not support a
conclusion that the State devoted an excessive amount of time to presenting
this evidence or that the evidence of gang affiliation presented was needlessly
repetitive.  The testimony of appellant’s
gang affiliation was a proportionately small part of Perez’s, Sandoval’s,
Quintanilla’s, and Cassidy’s testimony, and several witnesses did not testify
about gang activity at all.  Rather, the
evidence admitted was necessary to rebut appellant’s defensive theories as
presented by Perez’s and appellant’s statement and to prove appellant’s motive.

D.              
Evidence of Gang Affiliation during Punishment

Although
appellant does not specifically contest the admission of gang affiliation evidence
during punishment, he argues against that the trial court erred in admitting “all
evidence at trial” regarding gang affiliation, and his
brief specifically complains of testimony presented only during the punishment
phase of trial.  Thus, we also address
the trial court’s ruling to allow evidence of appellant’s gang affiliation
during punishment.

During
a trial’s punishment phase, evidence may be offered regarding any matter the
court deems relevant, including evidence of a defendant’s character or
reputation.  Tex Code Crim. Proc. Ann. art.
37.07, § 3(a)(1) (Vernon Supp. 2011).  Relevant evidence at the punishment stage is
not necessarily evidence deemed relevant under Rule 401, but instead consists
of anything that may help the jury determine the appropriate punishment.  See
Garcia v. State, 239 S.W.3d 862, 865
(Tex. App.—Houston [1st Dist.] 2007, pet. ref’d)
(citing Mendiola v. State, 21 S.W.3d 282, 285 (Tex.
Crim. App. 2000)).

Testimony
regarding a defendant’s affiliation with a gang may be relevant and admissible
during punishment to show the defendant’s character.  Beasley v. State, 902 S.W.2d 452, 456 (Tex. Crim. App. 1995).  The evidence does not have to link the
defendant to the bad acts or misconduct engaged in by the gang’s members, as
long as the jury is (1) provided with evidence of the defendant’s gang
membership, (2) provided with evidence of the character and reputation of the
gang, (3) not required to determine if the defendant committed bad acts or
misconduct, and (4) asked only to consider the reputation or character of the
accused.  Id. at 457.

During
punishment, the officers testified generally regarding MS-13 tattoos and the
history and context of MS-13 gang membership and affiliation, including its
high level of brutality.  Officer
Gorham-Maki further testified that the photographs admitted into evidence
depicting tattoos, hand signals, symbols, and clothing colors indicated that
appellant was a member of the MS-13 gang. 

This
testimony was sufficient to show that appellant was a member of MS-13.  See Garcia, 239 S.W.3d at 867 (holding that gang tattoos alone are
sufficient evidence of gang membership).  Officer Gorham-Maki also
testified regarding the character and reputation of MS-13 generally.  Evidence of appellant’s affiliation with a
well-known and dangerous gang was admissible during the punishment phase to
show appellant’s character.  See Dawson v. Delaware, 503 U.S. 159,
161, 163, 112 S. Ct. 1093, 1096–97 (1992). 

We
overrule appellant’s first issue. 

                                                                                                                                                  
Motion to Suppress

In his second issue, appellant asserts that the trial
court erred when it denied his motion to suppress because he: (1) did not
knowingly and intelligently waive his rights to remain silent and to be represented
by counsel; and (2) he gave the statement without knowing and completely
understanding his rights.

A.              
Relevant Background

At
the suppression hearing, Deputy Quintanilla testified that he discovered that
appellant was a suspect in Garcia’s murder after questioning Sandoval, who
“basically gave [officers] a synopsis of what happened, how it happened, how it
occurred, the people involved, and how the murder took place.”  Sandoval helped Deputy Quintanilla find
appellant’s and the other suspects’ apartments and informed the officers that
all of the suspects planned on collecting their paychecks and leaving Houston
first thing in the morning.

Deputy
Cassidy made the first contact with appellant at his apartment, informed
appellant why he was there, and received consent to search the apartment.  When Deputy Quintanilla arrived at
appellant’s apartment, Sandoval positively identified appellant as the person
who had stabbed Garcia.  At that time,
Deputy Quintanilla placed appellant under arrest, informed him that he was a
suspect in a murder investigation, and transported him to a police facility for
questioning.

Deputy
Quintanilla took a formal, video-recorded statement from appellant.  He testified that he read appellant his
rights in Spanish, that appellant verbally indicated that he understood those
rights, and that appellant agreed to waive those rights and make a
statement.  Quintanilla testified that he
offered appellant something to eat or drink, that he asked appellant if he
needed to use the bathroom, and that appellant did not appear to be
intoxicated.  He further testified that
he did not threaten or coerce appellant at any time during the recorded
interview and that he did not directly or indirectly promise appellant
anything.

The
State introduced a copy of the video recording of appellant’s statement, a written
transcript, and a translation of appellant’s statement.  According to the transcript, Deputy Rivera
asked appellant if he would like to use the restroom or get something to eat.  Per appellant’s request, Deputy Rivera brought
appellant “sugar water.” 

Deputy
Quintanilla began the interview by stating:

[Quintanilla]:        Look, I’m going to read this. We’re
going to start the interview, and I have to read something.  And you tell me if you understand or not.  Okay.  You
have the right to maintain your silence and say absolutely nothing.  Any statement you make can be used against you
in the cause in which you are accused.  Do
you understand what I’m telling you?

 

[Appellant]:                    No.

 

[Quintanilla]:        Why don’t you understand?

 

[Appellant]:                    Like,
well, nothing, I don’t understand anything.

 

[Quintanilla]:        Pardon?

 

[Appellant]:                    I
don’t understand anything. Can you repeat it?

 

[Quintanilla]:        But do you understand…

 

[Appellant]:                    Huh?
No, nothing, nothing.

          

Deputy
Quintanilla agreed that appellant answered “emphatically” that he did not
understand.  Deputy Quintanilla then
questioned appellant about his educational level and literacy.  Appellant told Quintanilla that he went to
the seventh grade and that he understood how to read.  Quintanilla  then asked appellant whether he “understand[s]
well,” and appellant responded, “Yes.”

Quintanilla
then proceeded to repeat appellant’s rights in Spanish and, pausing after each
one, asked appellant if he understood:

[Quintanilla]:        Ok. (inaudible)
You have the right to maintain your silence and say absolutely nothing. Any
statement you make may be used against you in the cause in which you are
accused. Do you understand that?

 

          [Appellant]:                   Uh huh.

 

          [Quintanilla]:        Yes?

 

[Appellant]:                    Yes.

 

[Quintanilla]:        Any statement you make can be used as
evidence against you in court. Do you understand that? Ok. You have the right
to have a lawyer present to advise you before questioning and during the time
you’re being questioned. Do you understand that? Yes? Say yes or no.

 

[Appellant]:                    Yes.

 

[Quintanilla]:        Ok. If you can’t employ a lawyer, you
have the right to have a lawyer appointed to you so that he can advise you
before or during the time you are questioned. Do you understand that?

 

[Appellant]:                    Yes.

 

[Quintanilla]:        You have the right to end this interview
at any moment you wish. Do you understand that?

 

[Appellant]:                    Yes.

 

[Quintanilla]:        Ok. Now you, I read you your rights,
understanding your rights, do you want to tell your part about what happened?
Yes? Ok. Um, start from, from Saturday. What happened Saturday when you arrived
at the party?

 

In
response to Deputy Quintanilla’s question, appellant began his statement.  Appellant told Quintanilla that, after he left
the party with Guevara and Perez, he fell asleep in the back seat and woke up
to Garcia attempting to take his wallet. 
He stated that Garcia first threatened him and attacked him with a
knife, and that, in the ensuing struggle, he hit
Garcia and caused Garcia to stab himself.

At
the hearing on his motion to suppress, appellant testified that he was scared
when the officers arrived at his apartment that morning, that Deputy Quintanilla
did not inform him that he was a suspect in a murder investigation, and that
when he arrived, and before he was taken to the interrogation room, he was
struck twice in the face by Deputy Rivera.  He further testified that although he
understood the words that Deputy Quintanilla was saying, he did not understand
their significance.  He testified that
although he eventually answered “yes” in response to the officer’s questions,
he did so because Deputy Rivera was “nodding his head at [him] like to say
‘yes.’”  Appellant further testified that
he was afraid of Deputy Rivera because police in his native country torture its
citizens and because Deputy Rivera had insulted and struck him previously.

Appellant
stated that he did not understand the American judicial system or that he was
going to make an oral statement.  Instead,
appellant believed a statement to be something written and signed.  He also testified that the deputies promised
that he could leave after he gave his statement and that they raised their
voices during the interrogation, which scared him.  On cross-examination, he admitted that there
were no visible injuries to his face following his interrogation.

At
the conclusion of the hearing, the trial court denied appellant’s motion to
suppress his statement.  It found that
appellant knowingly, intelligently, and voluntarily gave his statement and
waived his rights.  Because the deputy
asked if appellant wanted to tell what happened and appellant then answered,
the court found this to be an implicit waiver.  Furthermore, the court found Deputy
Quintanilla to be credible and appellant to be not credible.  Specifically, the court found it noteworthy
that because appellant understood and used words like “urinate” and
“significance,” and yet appellant stated that he did not understand the word “interview,”
it was likely that appellant was being dishonest.  In addition, the court found that because
appellant was asked and able to both use the restroom and have something to
drink, there was no force or coercion used in obtaining his statement.

B.              
Standard of Review

We
review the denial of a motion to suppress for an abuse of discretion.  Shepherd
v. State, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008).  We give almost total
deference to the trial court’s express or implied determinations of historical
facts while reviewing de novo the court’s application of the law to those
facts.  Id.; Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).  We view the evidence in the light most
favorable to the trial court’s ruling.  Shepherd, 273 S.W.3d
at 684.  The trial court is the
sole trier of fact and the judge of the credibility of the witnesses and the
weight to be given their testimony.  St. George v. State, 237
S.W.3d 720, 725 (Tex. Crim. App. 2007).  As a result, the trial court is free to
believe or disregard any or all of a witness’s testimony.  Green v. State,
934 S.W.2d 92, 98 (Tex. Crim. App. 1996).  We sustain the trial court’s ruling if it is
reasonably supported by the record and correct on any theory of law applicable
to the case.  Laney v. State,
117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

A
defendant’s statement may be used in evidence against him if he made it freely
and voluntarily and without compulsion or persuasion.  Tex. Code Crim. Proc. Ann. art.
38.21 (Vernon 2005). 
Code of Criminal Procedure article 38.22 specifically provides that an
oral statement given while an accused was in custody may not be used unless
“prior to the statement but during the recording the accused is given the
warning in Subsection (a) of Section 2 above and the accused knowingly,
intelligently, and voluntarily waives any rights set out in the warning.”  Id. art.
38.22, § 3(a)(2) (Vernon 2005).  Section 2(a) provides that the accused must
be warned that:

(1)     he has the right
to remain silent and not make any statement at all and that any statement he
makes may be used against him at his trial;

 

(2)     any statement he
makes may be used as evidence against him in court;

 

(3)     he has the right
to have a lawyer present to advise him prior to and during any questioning;

 

(4)     if he is unable to
employ a lawyer, he has the right to have a lawyer appointed to advise him
prior to and during any questioning; and

 

(5)     he has the right
to terminate the interview at any time. . . .

 

Id.
art. 38.22, § 2(a)(1)–(5).

A
defendant may claim that his statement was involuntary under several different
theories: (1) general involuntariness; (2) failure to warn against
self-incrimination; and (3) the deprivation of due process.  See Oursbourn v. State, 259 S.W.3d 159, 169 (Tex. Crim.
App. 2008); see also Moore v. State,
233 S.W.3d 32, 44 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding
statements may be deemed involuntary in instances of noncompliance with Code of
Criminal Procedure article 38.22, noncompliance with Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), or when
there is violation of due process or due course of law like coercion or threats)
(citing Wolfe v.
State, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996)).  “The determination of whether a confession is
voluntary is based on an examination of the totality of circumstance
surrounding its acquisition.”  Wyatt v. State, 23 S.W.3d 18, 23 (Tex.
Crim. App. 2000); see also Moore, 233
S.W.3d at 44 (holding that we must determine whether, in totality of
circumstances, defendant was coerced to degree that coercion, rather than his
free will, produced statement).

Once
a defendant raises the question of voluntariness, the State has the burden to
controvert the defendant’s evidence and must prove the voluntariness of the
confession by a preponderance of the evidence. 
Alvarado v.
State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).  If the defendant’s evidence is not
controverted by the State, then the confession is inadmissible as a matter of
law.  Brownlee v. State, 944 S.W.2d 463, 467
(Tex. App.—Houston [14th Dist.] 1997, pet. ref’d).  However, it is only necessary for the State
to controvert the evidence—it is not necessary for the State to rebut the
evidence.  Muniz v. State, 851 S.W.2d 238, 252
(Tex. Crim. App. 1993).

The
Court of Criminal Appeals has held that the following fact scenarios can raise
a state-law claim of involuntariness: “(1) the suspect was ill and on
medication and that fact may have rendered his confession involuntary”; “(2)
the suspect was mentally retarded and may not have ‘knowingly, intelligently
and voluntarily’ waived his rights”; (3) the suspect “lacked the mental
capacity to understand his rights”; (4) the suspect was intoxicated, and he
“did not know what he was signing and thought it was an accident report.”  Oursbourn, 259 S.W.3d at 172–73; see also Westly v. State, 754 S.W.2d 224,
229 (Tex. Crim. App. 1988) (considering suspect’s literacy); Armstrong v. State, 718 S.W.2d 686, 693
(Tex. Crim. App. 1985) (holding that relevant circumstances have included
length of detention, incommunicado or prolonged interrogation, refusing request
to telephone lawyer or friend, and physical brutality), overruled on other grounds, Mosely v. State,
983 S.W.2d 249, 264 (Tex. Crim. App. 1998). 
A defendant’s statement may also be involuntary if it was induced by a
promise that was: (1) positive; (2) of some benefit to the suspect; (3)
made or sanctioned by someone in authority; and (4) of such an influential
nature that a defendant would speak untruthfully in response.  Creager v. State, 952 S.W.2d 852, 856 (Tex.
Crim. App. 1997).

C.              
Analysis

Appellant
contends that his statement was involuntary because he was not aware of the
significance of his rights or the consequences of waiving those rights.  Appellant also argues that he was coerced and
intimidated into giving his statement by physical mistreatment and by the deputy’s
promises that he would be allowed to leave.

However,
Deputy Quintanilla testified that appellant was not mistreated and that the
deputies did not make any promises to him. 
The transcript of appellant’s interrogation shows that, prior to
questioning, Deputy Rivera—the officer who appellant asserts struck him—offered
appellant food, drink, and use of the restroom, and Rivera, at appellant’s
request, brought a “sugar water” for him to drink.  The transcript contains no threats, coercion,
or promises.  Furthermore, the alleged
promise in this situation—a promise that he could leave after he gave his
statement—is not of such an influential nature that a defendant would speak
untruthfully in response.  See Creager, 952 S.W.2d at 856.  

Appellant
also testified that he was unable to comprehend the significance of his rights
and the waiver of such rights.  At the
beginning of the interrogation, appellant clearly answered “no” in response to Deputy
Quintanilla’s questions concerning his understanding of his rights.  He testified that although he eventually
answered “yes,” he only did so out of fear of the deputies and because Deputy
Rivera was suggesting that “yes” was the correct way to respond.  

However,
after appellant told Deputy Quintanilla that he did not understand what was
being said to him, Quintanilla asked questions to establish that appellant was
literate and capable of understanding Spanish, that he was not ill or taking
any medications, and that he was not intoxicated or impaired in some way.  Quintanilla read appellant his rights in
Spanish a second time, pausing after each one to give appellant an opportunity
to respond.  Quintanilla testified that
he believed appellant understood his rights, and the transcript of the
interrogation shows that appellant responded in the affirmative.  See
Villarreal v. State, 61 S.W.3d 673, 678 (Tex. App.—Corpus Christi 2001, pet.
ref’d) (holding that Miranda waiver requirements are satisfied if, before making
statement, defendant is advised of his rights and merely states that he
understands them).  

The
trial court heard the testimony of the witnesses and determined Deputy
Quintanilla to be credible and appellant to be not credible, and because these
findings are supported by the record, we give almost total deference to this
determination.  See Shepherd, 273 S.W.3d at 684.  Looking at the totality of the circumstances,
we cannot say that the trial court abused its discretion in finding that appellant
was not coerced to the degree that coercion, rather than his free will,
produced his statement.  See Moore, 233 S.W.3d
at 44.

We
overrule appellant’s second issue.

                                                                                                                                   
Sufficiency of the Evidence

In his third issue, Rodriguez contends that had his statement
been suppressed, the State’s evidence was legally and factually insufficient to
support a murder conviction.  

In light of the Court of Criminal
Appeals’ recent holding in Brooks v. State that there is no meaningful
distinction between the standards for legal and factual sufficiency review, we
will review the evidence only for legal sufficiency.  323 S.W.3d 893, 912 (Tex. Crim. App. 2010)
(overruling Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996),
and holding that legal-sufficiency standard from Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781 (1979)
is only standard to be applied in determining whether evidence is sufficient to
support finding of each element of criminal offense beyond reasonable doubt).

When
reviewing the sufficiency of the evidence, we view the evidence in the light
most favorable to the verdict to determine whether any rational fact finder
could have found the essential elements of the offense beyond a reasonable
doubt.  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Brooks, 323 S.W.3d at 899, 912.  The jurors are the exclusive judges of the
facts, the credibility of the witnesses, and the weight to be given to the
testimony.  Brooks, 323 S.W.3d at 899.  A jury may accept one version of the facts
and reject another, and it may reject any part of a witness’s testimony.  Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000), overruled on other grounds, Laster v. State, 275 S.W.3d 512 (Tex. Crim.
App. 2009).  We may not
re-evaluate the weight and credibility of the evidence or substitute our
judgment for that of the fact finder.  Williams v. State, 235
S.W.3d 742, 750 (Tex. Crim. App. 2007). 
We resolve any inconsistencies in the evidence in favor of the
verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The
indictment alleges that appellant “unlawfully, intentionally, and knowingly
cause[d] the death of Ernesto Garcia . . . by stabbing the complainant with a
deadly weapon, namely a knife.”  See Tex
Penal Code Ann. § 19.02(b)(1) (Vernon 2011).

Appellant
argues that the evidence was insufficient without the improper admission of the
statement he made to police.  However, we
have already held that the trial court did not abuse its discretion in denying
appellant’s motion to suppress, and thus appellant’s statement was properly
before the jury.  Appellant also argues
that Sandoval and Perez were accomplices to the murder, that their testimony
could not support his conviction because it was uncorroborated by non-accomplice
evidence, and that their testimony was not credible, dependable, or
reliable.  

Code of Criminal Procedure article 38.14 provides:

A conviction
cannot be had upon the testimony of an accomplice unless corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.

 

Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).

          “An accomplice is someone who
participates with the defendant before, during, or after the commission of a crime
and acts with the required culpable mental state.”  Druery v. State, 225 S.W.3d 491, 498 (Tex.
Crim. App. 2007).  A witness is
not an accomplice merely because he knew of the offense and did not disclose it
or concealed it—the witness’s participation with the defendant must have
involved some affirmative act that promoted the commission of the offense.  Id.  “[T]he witness’s mere presence at the scene
of the crime does not render that witness an accomplice witness.”  Id.

When
evaluating the sufficiency of corroboration evidence under the accomplice
witness rule, we “eliminate the accomplice testimony from consideration and
then examine the remaining portions of the record to see if there is any
evidence that tends to connect the accused with the commission of the crime.”  Malone
v. State, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting Solomon v. State, 49 S.W.3d 356, 361
(Tex. Crim. App. 2001)).  To meet the
requirements of the rule, the corroborating evidence need not prove the
defendant’s guilt beyond a reasonable doubt by itself.  Id.  Nor is it necessary for the corroborating
evidence to directly link the accused to the commission of the offense.  Cathey v. State, 992 S.W.2d 460, 462 (Tex.
Crim. App. 1999).  “Rather, the
evidence must simply link the accused in some way to the commission of the
crime and show that ‘rational jurors could conclude that this evidence
sufficiently tended to connect [the accused] to the offense.’”  Malone,
253 S.W.3d at 257 (quoting Hernandez v.
State, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)).

          Each case must be judged on its own
facts, as there is no set amount of non-accomplice corroboration evidence that
is required for sufficiency purposes.  Id. 
Circumstances that are apparently insignificant may constitute
sufficient evidence of corroboration.  Trevino v. State, 991
S.W.2d 849, 852 (Tex. Crim. App. 1999). 
Additionally, while the mere presence of a defendant at the scene of a
crime is, by itself, insufficient to corroborate accomplice testimony, “[p]roof
that the accused was at or near the scene of the crime at or about the time of
its commission, when coupled with other suspicious circumstances, may tend to
connect the accused to the crime so as to furnish sufficient corroboration to
support a conviction.”  Malone, 253 S.W.3d at 257 (quoting Brown v. State, 672 S.W.2d 487, 489
(Tex. Crim. App. 1984)).

The
trial court instructed the jury that, as a matter of law, Perez was an
accomplice, and thus the jury could not convict appellant based on Perez’s
testimony unless it believed that there was other evidence in the case, outside
the testimony of Perez, tending to connect appellant with the commission of the
offense.  The jury was also instructed that
if it believed that Sandoval was an accomplice or if it had a reasonable doubt
whether he was or not, then it could not convict appellant based upon
Sandoval’s testimony unless it further believed that there was other evidence
in the case, outside the testimony of both Sandoval and Perez, tending to
connect appellant with commission of the offense.

Regarding
Sandoval’s testimony, the jury was permitted to determine that Sandoval was not
an accomplice, and thus his testimony did not require corroborating evidence
before it could be considered.  See Druery,
225 S.W.3d at 498–99 (“If the evidence presented by the parties is conflicting
and it remains unclear whether the witness is an accomplice, the trial judge
should allow the jury to decide whether the inculpatory
witness is an accomplice witness as a matter of fact. . . .”).  Sandoval’s own testimony indicated that he
did not participate in the commission of the murder in any way—he agreed to
drive the other four men to get beer and witnessed the murder.  He testified that Guevara returned him to the
party, drove off in his vehicle, and then called the next morning to tell him
that his truck had been burned and that he should report it stolen.  

At
most, Sandoval was present at the scene of the crime and concealed its
occurrence from investigators, but this is not sufficient to show that he acted
as an accomplice.  See id. at 498. Furthermore, Deputies Cassidy and Quintanilla both testified that
they did not consider Sandoval a suspect in the investigation, and Cassidy
testified that Sandoval was fearful of telling the truth about the murder
because he believed MS-13 was a threat to his family.  Thus, we conclude that the jury could have
considered Sandoval’s testimony without corroborating evidence.  See id.
at 498–99; see
also Curry, 30 S.W.3d at 406 (holding that we resolve any inconsistencies
in evidence in favor of verdict).

Furthermore,
appellant’s own statements indicate that he was at the scene of the murder and
provide evidence of suspicious factors that are sufficient to corroborate
Perez’s testimony and tend to connect appellant with the crime.  See
Malone, 253 S.W.3d at 257; see also
Cox v. State, 830 S.W.2d 609, 611–12 (Tex. Crim. App. 1992) (holding that
appellant’s confession that he was at scene, combined with other suspicious
factors, was sufficient to corroborate accomplice testimony).  In his statement, appellant explained that he
acted in response to Garcia’s attempt to steal his wallet,
that Garcia was the one who instigated the attack by making threats and
brandishing a knife, and that Garcia was somehow stabbed in the course of the
ensuing struggle.  Deputies Rivera and
Cassidy testified that when they went to appellant’s apartment to investigate,
they found him hiding in a bedroom and that appellant was “acting weird.”

Thus
we conclude that Perez’s testimony was sufficiently corroborated by non-accomplice
evidence.  See Malone, 253 S.W.3d at 257

Viewing
the evidence in the light most favorable to the verdict, we conclude that a
rational fact finder could have found that appellant intentionally and
knowingly stabbed Garcia to death. 
Sandoval testified that he saw appellant stab Garcia.  Perez acknowledged that he had previously
told police that he and appellant killed Garcia as part of a “mission” for the
MS-13 gang, that he and appellant both stabbed Garcia, and that appellant
“finished off” Garcia after Perez’s knife broke.  Dr. Anzalone
testified that Garcia died of multiple sharp-force injuries,
that many of his wounds could have been fatal, and that two different
sharp-edged instruments could have been used to cause Garcia’s injuries.

We
conclude that the evidence was sufficient to support appellant’s conviction.

We
overrule appellant’s third issue.

                                                                                                                                                                   
Conclusion

We affirm the judgment of the trial court.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and
Massengale.

Do not publish. 
 Tex. R. App. P. 47.2(b).











[1]           See Tex. Penal Code Ann. § 19.02(b) (Vernon 2011).